SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
PETER H. KLEE, Cal. Bar No. 111707
MARC J. FELDMAN, Cal. Bar No. 144830
SUZANNE L. SPECKER, Cal. Bar No. 330278
501 West Broadway, 19th Floor
San Diego, California 92101-3598
Telephone:   619.338.6500
Facsimile:   619.234.3815
E mail:      pklee@sheppardmullin.com
             mfeldman@sheppardmullin.com
             sspecker@sheppardmullin.com

Attorneys for ALLSTATE
NORTHBROOK INDEMNITY
COMPANY (erroneously sued as
ALLSTATE INSURANCE COMPANY)

BRIAN BRANDT, ESQ. (S.B. No. 130527)
LAW OFFICES OF BRIAN BRANDT
309 N. Euclid Avenue
Upland, CA  91786
(909) 932-1162 – phone
(909) 932-1161 – fax

Attorney for Plaintiff,
ROBERT FIRCHOW

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT FIRCHOW,<br><br>          Plaintiff,<br><br>     v.<br><br>ALLSTATE INSURANCE<br>COMPANY, and DOES 1 through 25,<br>inclusive,<br><br>          Defendants. | Case No. 2:20-cv-09169-FMO-JPR<br><br>**JOINT BRIEF REGARDING ALLSTATE'S SUMMARY JUDGMENT MOTION**<br><br>Hearing Date:   August 19, 2021<br>Hearing Time:  10:00 a.m.<br>Courtroom:      6D<br><br>Honorable Judge Fernando M. Olguin<br><br>Complaint Filed:  September 2, 2020<br>Trial Date:          December 14, 2021 |

# TABLE OF CONTENTS

**Page**

I.      ALLSTATE'S INTRODUCTION ................................................................. 1

    A.      Background ............................................................................... 1

    B.      Galvez's demands were not reasonable ................................... 2

    C.      Allstate did not act unreasonably ........................................... 3

II.     ALLSTATE'S UNDISPUTED FACTS ........................................................ 4

    A.      Firchow hits Galvez ................................................................ 4

    B.      Galvez demands the policy limit but fails to provide any
        medical bills or signed medical/wage authorizations ............ 5

    C.      Allstate requests more time to evaluate Galvez's claim ......... 6

    D.      Galvez makes a second, short-fuse policy limit demand ....... 7

    E.      Allstate quickly reviews the newly submitted information and
        immediately offers the policy limit, but Galvez does not
        accept ....................................................................................... 7

    F.      Galvez files suit the same day that Allstate offers the policy
        limit ......................................................................................... 8

III.    FIRCHOW'S BAD FAITH CLAIM FAILS AS A MATTER OF
    LAW ................................................................................................ 9

    A.      The general legal standards for a bad faith refusal to settle
        claim ........................................................................................ 9

    B.      The Court can determine reasonableness as a matter of law ............... 10

    C.      Galvez's demands were not reasonable ................................. 10

        1.      The first demand did not provide information showing
            that an excess judgment was likely .............................. 10

        2.      The demands did not give Allstate enough time to
            evaluate Galvez's claim ............................................... 12

    D.      Allstate did not unreasonably refuse to settle ...................... 13

        1.      Allstate did not refuse to settle at all ......................... 14

        2.      Allstate did not *unreasonably* refuse to settle ......... 15

    E.      Allstate paid 17 times the limit to satisfy the judgment ...... 18

IV.     FIRCHOW'S BREACH OF CONTRACT CLAIM LACKS MERIT .......... 19

V.      THE CLAIM FOR PUNITIVE DAMAGES CANNOT SURVIVE ............. 20

VI.     CONCLUSION ............................................................................... 22

VII.    FIRCHOW'S INTRODUCTION .................................................... 22

-i-

VIII.  PLAINTIFF'S UNDISPUTED FACTS ..........................................................26

IX.  ALLSTATE HAS FAILED TO MEET ITS BURDEN OF PRESENTING FACTS THAT SUPPORT SUMMARY JUDGMENT ...........................................................................................29

A.  Legal Standards Governing Bad Faith Actions For Failure To Settle .......................................................................................................29

B.  Summary Judgment Should Be Denied When The Evidence Permits Conflicting Factual Inferences...................................................31

C.  Both Of Galvez's Settlement Demands Were Reasonable And Should Have Been Accepted .........................................................31

1.  The November 20, 2015, Settlement Demand Was Reasonable .....................................................................................31

2.  The January 6, 2016, Settlement Demand Was Reasonable ..................................................................................34

D.  Allstate Did Not Act Reasonably.........................................................34

E.  Allstate Unreasonably Refused To Settle The Case ............................39

IV.  The Breach Of Contract Claim Is Viable ......................................................40

V.  Firchow Has A Valid Claim For Punitive Damages .....................................41

IX.  CONCLUSION ...............................................................................................42

## <u>TABLE OF AUTHORITIES</u>

Page(s)

<u>Cases</u>

*AAA Nevada Ins. Co. v. Vinh Chau*
  808 F.Supp. 2d 1282 .................................................................. 13

*Aceves v. Allstate Ins. Co.*
  68 F.3d 1160 (9th Cir. 1995) ..................................................... 17

*Allen v. Allstate Ins. Co.*
  656 F.2d 487 (9th Cir. 1981) ................................................29, 31

*Am. Mut. Ins. Co. of Boston v. Bittle* (Md. Ct. Spec. App. 1975)
  338 A.2d 306 ............................................................................ 13

*Amadeo v. Principal Mut. Life Ins. Co.* (9th Cir.2002)
  290 F.3d 1152 ........................................................................... 31

*Anderson v. Liberty Lobby Inc.*
  477 U.S. 242 (1986) .................................................................. 21

*In re Angelia P.*
  28 Cal. 3d 908 (1981) ............................................................... 21

*Archdale v. Am. Internat. Specialty Lines Ins. Co.*
  154 Cal. App. 4th 449 (2007)...........................................19, 20, 40, 41

*Beck v. State Farm*
  54 Cal. App. 3d 347 (1976) ....................................................... 21

*Boicourt v. Amex Assurance Co.*
  78 Cal. App. 4th 1390 (2000)................................................18, 39

*Brown v. Guarantee Ins. Co.*
  155 Cal. App. 2d 679 (1957) ..................................................... 15

*Camelot by the Bay Condo. Owners' Assn. v. Scottsdale Ins. Co.*
  27 Cal. App. 4th 33 (1994) ........................................................ 10

*Carlton v. St. Paul Mercury Ins. Co.*
  30 Cal. App. 4th 1450 (1994) .................................................... 10

*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.*
   90 Cal. App. 4th 335 (2001) ................................................................ 10

*Clauss v. Fortune Ins. Co*. (Fla. Ct. App. 1988)
   523 So.2d 1177 ....................................................................................... 13

*Coe v. State Farm Mut. Auto. Ins. Co.*
   66 Cal. App. 3d 981 (1977) .................................................................. 10

*Commercial Union Assur. Cos.* v. *Safeway Stores, Inc.*
   26 Cal. 3d 912 (1980) ........................................................................... 14

*Cornerstone Nat. Ins. Co. v. Itule*
   2014 WL 4897364 (D. Ariz. Sept. 30, 2014) ...................................... 17

*Crisci v. Security Ins. Co*
   66 Cal 2d 425 (1967) .................................................................. 29, 30, 40

*Critz v. Farmers Ins. Grp.*
   230 Cal. App. 2d 788 (1967) ........................................................ 14, 29

*Cruz v. HomeBase*
   83 Cal. App. 4th 160 (2000) ................................................................ 22

*Dean v. Foremost Affiliated Ins. Servs.*
   2011 WL 1863283 (Ariz. Ct. App. May 10, 2011) ........................... 17

*DeWitt v. Monterey Ins. Co.*
   204 Cal. App. 4th 233, 138 Cal. Rptr. 3d 705 (2012) ....................... 29

*Food Pro Internat., Inc. v. Farmers Ins. Exch.*
   169 Cal. App. 4th 976 (2008) .............................................................. 21

*Glenn v. Fleming* (Kan. 1990)
   799 P.2d 79 ............................................................................................ 13

*Graciano v. Mercury Gen. Corp.*
   231 Cal. App. 4th 414 (2014) ....................... 9, 10, 12, 14, 17, 18, 29, 36, 37

*Grayson v. Allstate Ins. Co.*
   650 F. App'x 320 (9th Cir. 2016) ........................................... 10, 14, 17

*Hamilton v. Maryland Cas. Co.*
   27 Cal. 4th 718 (2002) ................................................................... 9, 14

*Highlands Ins. Co. v. Cont'l Cas. Co.*
  64 F.3d 514 (9th Cir. 1995) ........................................................................ 10

*Johansen v. Cal. State Auto Ass'n Inter-Ins. Bureau*
  15 Cal. 3d 9 (1975) ..................................................................................... 10

*Kransco v. Intl. Ins. Co.,* 23 Cal. 4th 390 (2000) ........................................ 14

*Madrigal v. Allstate Ins. Co.*
  215 F.Supp. 3d 870 (C.D. Cal. 2016) ..................................................... 29, 30

*Martin v. Hartford Acc. & Indem. Co.*
  228 Cal. App. 2d 178 (1964) ....................................................................... 18

*McDaniel v. Gov't Employees Ins. Co.*
  681 F. App'x 614 (9th Cir. 2017) ............................................. 10, 16, 17, 38, 39

*O'Hara v. Western Seven*
  75 Cal. App. 3d 798 (1977) ......................................................................... 21

*Pinto v. Farmers Ins. Exch.*
  61 Cal. App. 5th 676, 276 Cal. Rptr. 3d 13 (2021) ................................. 9, 15, 17

*Prudential Ins. Co. of Am. v. Coleman*
  428 So. 2d 593 (Ala. 1983) ......................................................................... 18

*Pureco v. Allstate Indem. Co.*
  817 F. App'x 398 (9th Cir. 2020) ............................................. 10, 15, 16, 37, 38

*Rawlings v. Apodaca*
  151 Ariz. 149 (Ct. App. 1986) ..................................................................... 18

*Roberts v. Printup*
  422 F.3d 1211 (10th Cir. 2005) ................................................................... 17

*Rogers v. Gov't Employees Ins. Co.* (La. Ct. App. 1992)
  598 So.2d 670 ............................................................................................. 13

*Shade Foods, Inc. v. Innovative Prods. Sales & Mktg.*
  78 Cal. App. 4th 847 (2000) ....................................................................... 21

*Stewart v. Truck Ins. Exch.*
  17 Cal. App. 4th 468 (1993) ....................................................................... 21

*Tento Int'l, Inc. v. State Farm Fire & Cas. Co.*
   222 F.3d 660 (9th Cir. 2000) ................................................................................ 17

*Tomaselli v. Transamerica Ins. Co.*
   25 Cal. App. 4th 1269 (1994) ................................................................... 22, 41

*Walbrook Ins. Co. v. Liberty Mut. Ins. Co.*
   5 Cal. App. 4th 1445 (1992) ..................................................................... 15, 17

*White v. Ultramar, Inc.*
   21 Cal. 4th 563 (1999) ........................................................................................ 22

*White v. Western Title Ins. Co.*
   40 Cal. 3d 870 (1985) (Kaus, J., concurring and dissenting) ............................ 12

*Wiebe v. Hicks* (Kan. App. 2008)
   2008 WL 4291641 ............................................................................................... 13

*Wilson v. 21st Century Ins. Co.*
   42 Cal. 4th 713 (2007) ................................................................................ 15, 37

<u>Statutes</u>

Cal. Civ. Code § 3294 ................................................................................... 20, 41

Cal. Civ. Code § 3294(c)(1) ................................................................................ 21

Cal. Civ. Code § 3294(c)(2) ................................................................................ 20

Cal. Civ. Code § 3294(c)(3) ................................................................................ 20

I.      **ALLSTATE'S INTRODUCTION**

     California courts developed the law of insurance bad faith to prevent insurers from "gambling" with their insureds' money – refusing to accept offers to settle within the policy limit in the hope that they can get away with paying less. Bad faith law, however, was not designed to punish – and does not hold liable – an insurer who tries to protect its insured and *accept* a policy limit offer. Nor was bad faith law designed to punish an insurer who, although under no obligation to do so, further protects its insured by satisfying a judgment that is far above the policy limit. That is what Allstate did here. And that is why this bad faith lawsuit is frivolous.

     **A.**      **Background**

     In October 2015, Plaintiff Robert Firchow was driving drunk and hit pedestrian Celeste Galvez in a cross-walk. She sustained a bruised knee and broken ankle. Firchow was arrested and ultimately pled no contest to a DUI.

     Firchow had an Allstate auto insurance policy with a bodily injury liability limit of $100,000. Less than a month after the accident, Galvez's law firm, The Dominguez Firm, made a settlement demand for the $100,000 policy limit. But aside from some medical records reflecting that Galvez had ankle surgery and that she was "recovering well," the demand lacked the critical information that Allstate needed to evaluate the claim's value. Specifically, The Dominguez Firm: (i) did not provide any information about Galvez's medical expenses or any medical records indicating that she would need further treatment beyond usual and customary follow-up appointments with her doctor and possibly some physical therapy, and (ii) impeded Allstate's ability to obtain this information itself by not providing the medical records authorization that Allstate had requested. Therefore, Allstate requested an extension of the demand deadline until it had received the missing records. The Dominguez Firm refused to provide the requested extension.

     The Dominguez Firm then mailed Allstate the medical expense information that it had previously withheld. Its cover letter again demanded the policy limit, this

1   time with a deadline of just three business days from the day that Allstate received

2   it.  The handling Allstate adjuster was out on vacation until the day that the new

3   demand expired and did not see it that day.  That evening, however, attorney

4   Matthew Joy of The Dominguez Firm called Allstate to announce that the deadline

5   had expired.  While still on the phone with Joy, the adjuster found the demand and

6   immediately asked for a brief, two-day extension to respond.  Joy refused.

7          Nevertheless, Allstate reviewed the new information and tendered the

8   $100,000 policy limit *less than 48 hours* after the arbitrary deadline.  But Joy had

9   other plans.  He refused to accept the tender and instead filed a lawsuit the same

10  day.  The case eventually went to trial and resulted in a $2.427 million judgment

11  against Firchow. Although under no obligation to do so, Allstate negotiated the

12  judgment down by over half-a-million dollars to $1.75 million and *paid* it on

13  Firchow's behalf.

14         But proving that no good deed goes unpunished, Firchow brought this bad

15  faith lawsuit against Allstate.  Lacking any other arguable damages, Firchow

16  contends that Allstate is liable for his alleged emotional distress because it tendered

17  the policy limit two days after Galvez's arbitrary deadline.

18         Firchow's manufactured lawsuit, however, fails as a matter of law.  To

19  establish a claim for bad faith refusal to settle, a plaintiff must show that: (i) the

20  claimant made a *reasonable* offer to settle within the policy limit, and (ii) the insurer

21  *unreasonably* refused to accept the offer.  Here, Firchow cannot satisfy either

22  requirement.

23         **B.    Galvez's demands were not reasonable**

24         First, a demand is reasonable only if, *at the time of the demand*, there is a

25  substantial likelihood that the claimant will recover a judgment above the policy

26  limit.  Here, Galvez's first demand fell far short of that requirement.  It informed

27  Allstate that Galvez had broken her ankle and was "recovering well."  But it did not

28  provide *any* information at all about her medical expenses or whether she would

require further treatment beyond the minimal anticipated follow-up noted in her records.  Further proof that the first demand was deficient is that The Dominguez Firm later sent the missing medical bills and renewed the demand.

Second, to be reasonable, a demand must also give the insurer an adequate opportunity to investigate the claim and evaluate its worth.  Neither of Galvez's demands gave Allstate that opportunity.

The first demand gave Allstate a 24-day deadline from Allstate's receipt.  But because it did not provide any medical bills or information about future treatment beyond the minimal anticipated follow-up noted in Galvez's records, that was not enough time for Allstate to make any progress in evaluating the claim.  And The Dominguez Firm ignored Allstate's request for an extension.

The second demand also did not give Allstate an adequate opportunity to evaluate the claim because it was received on a Friday and gave Allstate just *three* business days from Allstate's receipt to respond.  And Joy again rejected Allstate's request for an extension – this time, of only two additional days.

Thus, Galvez's two offers to settle were not reasonable and cannot give rise to bad faith liability.

### C.    Allstate did not act unreasonably

To be liable for an excess judgment, an insurer also must *unreasonably* refuse to settle within the policy limit.  That didn't happen here.

First, Allstate did not *refuse* to settle at all.  Rather, it responded to the first demand by explaining that it needed more information and time to investigate and evaluate the claim.  When it saw the second demand, Allstate responded by offering the policy limit less than 48 hours after the short-fuse deadline expired – and that is only because Joy refused to extend it.

Second, Allstate did not *unreasonably* refuse to settle.  Here, Allstate responded to the first demand by identifying the additional information it needed to fairly evaluate the claim and requesting an extension to obtain that information.

With respect to the second demand that included some of the missing information, Allstate had only three business days to respond, the adjuster was on vacation until the day that the new demand expired, and upon first learning of the demand 15 minutes after it expired, she asked for a brief extension.  When that request was denied, she nevertheless evaluated the new information enclosed with the demand and tendered the policy limit only two days later.  That is not an unreasonable refusal to settle.

At worst, the adjuster's failure to see the second demand earlier was mere inadvertence or clerical error.  As a matter of law, that type of conduct is not bad faith.

<u>Finally</u>, although not required to do so, Allstate *paid* 17 times the policy limit to satisfy the excess judgment and protect Firchow.  That's not an unreasonable refusal to settle.  That is going above and beyond to settle a claim.

The Court should grant summary judgment for Allstate and end this meritless lawsuit.

## II.  **ALLSTATE'S UNDISPUTED FACTS**

### A.  **Firchow hits Galvez**

On October 23, 2015, Firchow was driving his pick-up truck and hit Galvez. (JA 277 (Feldman Decl. ¶ 2); JA 5,6 (Ex. 1 at 26:5-7; 29:5-8) (D1))  Firchow had a blood alcohol level of 0.15 percent, nearly twice the legal limit.  (JA 277 (Feldman Decl. ¶ 2); JA 7 (Ex. 1, Firchow Depo. at 31:9-16) (D2))  Firchow was arrested, spent four nights in jail, and ultimately pled no contest to a DUI.  (JA 277 (Feldman Decl. ¶ 2); JA 7-8, 9 (Ex. 1, Firchow Depo. at 31:17-32:3; 42:1-8) (D3))

At the time of the accident, Firchow was insured under an Allstate automobile policy with a bodily injury liability limit of $100,000 per person.  (JA 266 (Legrand Decl. ¶ 4); (Complaint ¶¶ 5, 8) (D4))

On November 17, 2015, Allstate received a letter of representation from the law firm representing Galvez, The Dominguez Firm.  (JA 266-267 (Legrand Decl. ¶

5); JA 12 (Ex. 2) (D5))  The letter did not disclose any information about Galvez's injuries or treatment.  (*Id.*) (D6)

On November 20, 2015, Allstate wrote to The Dominguez Firm and requested information regarding Galvez's injuries and damages, along with signed authorizations to obtain medical and wage records so that Allstate could obtain the information needed to evaluate the claim.  (JA 267 (Legrand Decl. ¶ 6); JA 14-25 (Ex. 3) (D7-8))  The Dominguez Firm never returned them.  (JA 267 (Legrand Decl. ¶ 6) (D9))

**B.    Galvez demands the policy limit but fails to provide any medical bills or signed medical/wage authorizations**

On November 20, 2015 – less than a month after the accident – The Dominguez Firm sent Allstate a policy limit demand with an expiration date of December 21, 2015.  (JA 267 (Legrand Decl. ¶ 7) JA 27 (Ex. 4) (D10-11))  Allstate did not receive the demand until the evening of Friday, November 27, 2015 – the day after Thanksgiving.  (*Id.*) (D10)

The demand enclosed the police report and some medical records, which showed that Galvez:

- sustained a right knee abrasion and contusion (a scraped and bruised knee), which resolved (JA 45, 62 (Ex. 4) (D12));
- sustained a fractured ankle, for which she received surgery (JA 58 (Ex. 4) (D12));
- was discharged two days after her surgery (JA 45 (Ex. 4) (D13));
- received two sessions of physical therapy, after which her records noted, "No further physical therapy indicated at this time"  (JA 95-96 (Ex. 4 (D13)); and
- had seen her primary care doctor on November 4, 2015, who noted that she was "recovering well" and that her "pain is under control." (JA 209 (Ex. 4 (D13))

1    The demand did not contain any medical records indicating that she would

2  need further treatment beyond usual and customary follow-up appointments with her

3  doctor and possibly some physical therapy.  (JA 267 (Legrand Decl. ¶ 7); JA 88, 95,

4  166, 168 (Ex. 4) (D14-D15))  Nor did it include any of Galvez's medical bills or

5  health insurance information.  (JA 267 (Legrand Decl. ¶ 7); JA 27-221 (Ex. 4)

6  (D14))  Instead, the letter stated that the billing information was "pending."  (JA 267

7  (Legrand Decl. ¶ 7); JA 28 (Ex. 4) (D16))  The demand did, however, invite Allstate

8  to "communicate in writing to the Firm, whatever 'problems' [Allstate] deem[ed] to

9  exist," and that "[i]f [Allstate's] written problems establish good cause, then the

10  Firm w[ould] grant an extension of time" to accept the demand.  (JA 267 (Legrand

11  Decl. ¶ 7); JA 29 (Ex. 4) (D17))

12    **C.    Allstate requests more time to evaluate Galvez's claim**

13    The incomplete information included with the demand did not show that the

14  claim was worth the $100,000 policy limit.  In fact, the assigned adjuster, Cathy

15  Legrand, had previously adjusted numerous broken ankle claims that were resolved

16  for less than $100,000.  (JA 267 (Legrand Decl. ¶ 7) (D18))  In order to determine

17  whether Galvez's damages would justify a policy limit settlement, Allstate needed

18  to know the amount of her medical bills, as well as to what extent she would need

19  further treatment in the future.  (JA 267-268 (Legrand Decl. ¶ 8) (D19))  Thus, on

20  December 15, 2015, Allstate wrote to The Dominguez Firm – as the demand letter

21  expressly invited it to do.  (JA 267-268 (Legrand Decl. ¶ 8); JA 223 (Ex. 5) (D20))

22  Allstate identified the additional information it needed to evaluate the claim

23  (medical bills and records showing whether Galvez received further treatment

24  during recovery) and requested an extension of the demand deadline until Allstate

25  had received and reviewed those missing records.  (JA 267-268 (Legrand Decl. ¶ 8);

26  JA 223 (Ex. 5) (D21))  Rather than granting the requested extension, or even

27  advising Allstate that it wouldn't, The Dominguez Firm simply ignored the request

28  and the demand expired.  (JA 268 (Legrand Decl. ¶¶ 8,10) JA 228 (Ex. 7) (D22-23))

**D.    Galvez makes a second, short-fuse policy limit demand**

Apparently, The Dominguez Firm recognized that Allstate's request for more information was reasonable.  On January 6, 2016, it mailed Allstate one of the items it had requested, an itemized medical bill, which reflected total hospital charges of just under $60,000.  (JA 268 (Legrand Decl. ¶ 10); JA 231 (Ex. 7) (D25))  This letter included a second demand for the policy limit – but with an exceedingly short deadline of January 13.  (JA 268 (Legrand Decl. ¶ 10); JA 228 (Ex. 7) (D26))  Allstate did not receive the letter until Friday, January 8, 2016.  (JA 268, 269 (Legrand Decl. ¶¶ 10, 12); JA 228, 263 (Ex. 7, 13) (D24))  The adjuster assigned to the claim, Cathy Legrand, was on a brief vacation that day through the following Monday and Tuesday, January 11 and 12.  (JA 268-269 (Legrand Decl. ¶ 11) (D27))  She returned to the office on January 13, but she did not see the demand.  (JA 268-269 (Legrand Decl. ¶¶ 11-12) (D28))

After hours on January 13, 2016, at approximately 5:15 p.m., Galvez's attorney, Matthew Joy of The Dominguez Firm, called Allstate.  (JA 269 (Legrand Decl. ¶ 12); JA 263 (Ex. 13) (D29))  Legrand, who was still at the office catching up on her work, picked up the phone.  (*Id.*)  Attorney Joy expressed surprise that someone had answered his after-hours call, and then stated that the demand had expired.  (*Id.*)  Legrand responded that she was unaware of a pending demand.  (*Id.*) (D30)  While she was still on the phone with Joy, Legrand searched for and found the correspondence at the bottom of a stack of papers.  (*Id.*) (D31)  Legrand immediately asked Joy for a brief extension of only two days so that she could evaluate the new information and respond to it.  (*Id.*) (D32)  Joy, however, refused to grant any extension whatsoever.  (*Id.*) (D33)

**E.    Allstate quickly reviews the newly submitted information and immediately offers the policy limit, but Galvez does not accept**

The next day, Allstate evaluated the new information.  (JA 269-270 (Legrand Decl. ¶ 14) (D34))  The billing record not only showed the amount of billed charges,

1  but also showed that Galvez had additional treatment beyond that reflected in the

2  records previously provided:  On November 10, 2015, Galvez attended an

3  orthopedic follow-up exam where she received an x-ray and was put in a "short leg

4  cast."  (JA 269-270 (Legrand Decl. ¶ 14); JA 230-231 (Ex. 7) (D34))

5      Based on this new information, specifically, the amount of medical charges

6  and the fact that Galvez had received treatment beyond that shown in the records

7  provided with the first demand, Allstate concluded that a policy limit settlement was

8  warranted.  (JA 269-270 (Legrand Decl. ¶ 14) (D35))  On January 15, 2016, *less

9  than 48 hours* after the expiration of Galvez's short-fuse demand, Allstate faxed a

10  letter to The Dominguez Firm tendering the policy limit and left Joy a voicemail that

11  it had faxed the policy limit to his office.  (JA 270 (Legrand Decl. ¶ 15); JA 236

12  (Ex. 9) (D36-D37))

13      **F.  Galvez files suit the same day that Allstate offers the policy limit**

14      Rather than accepting the $100,000 policy limit, The Dominguez Firm filed a

15  lawsuit against Firchow on January 15, 2016 – the same day that Allstate offered the

16  policy limit.  (JA 273 (Arambula Decl., ¶ 4) (D38))  Allstate retained counsel to

17  defend Firchow.  (*Id.*) (D39)

18      After the lawsuit was filed, Galvez's condition changed for the worse:  she

19  experienced further complications from her ankle injury that required her to later

20  undergo another surgery.  (JA 273-274 (Arambula Decl., ¶ 5); JA 241-243 (Ex. 10)

21  (D40))  Even after the second surgery, she continued to complain of pain.  (*Id.*)  In

22  April 2019, Galvez's lawsuit went to trial, and the jury returned a verdict of over

23  $2.427 million against Firchow.  (JA 274 (Arambula Decl., ¶¶ 6-7) (Plaintiff's

24  Complaint, ¶ 13) (D41))  Judgment was entered against Firchow on May 23, 2019.

25  (JA 274 (Arambula Decl., ¶ 7) (Plaintiff's Complaint ¶ 13) (D42))  Allstate then

26  issued a check for the $100,000 policy limit to Galvez.  (JA 274 (Arambula Decl., ¶

27  7); JA 249-250 (Ex. 11) (D43))

28

1    Although Allstate owed no responsibility for the excess judgment, it

2 nevertheless agreed to mediate with Galvez to see if a compromise could be reached

3 that would protect Firchow.  (JA 274 (Arambula Decl., ¶ 8); JA 280 (Klee Decl. ¶ 2)

4 (D44))  Following that mediation, in early 2020, Allstate settled the judgment for

5 $1.75 million (an over $500,000 discount) and obtained a full release of Firchow.

6 (JA 274 (Arambula Decl., ¶ 8); JA 251-254 (Ex. 11); JA 280 (Klee Decl. ¶ 2); JA

7 256-261 (Ex. 12) (D44))

8    In September 2020, Firchow filed this lawsuit against Allstate.

9 **III.   FIRCHOW'S BAD FAITH CLAIM FAILS AS A MATTER OF LAW**

10    **A.   The general legal standards for a bad faith refusal to settle claim**

11    To succeed on a claim for bad faith failure to settle, a plaintiff must prove two

12 elements:

13    <u>First</u>, the plaintiff must show that the claimant "made a ***reasonable offer*** to

14 settle the claims against the insured for an amount within the policy limits."

15 *Graciano v. Mercury Gen. Corp.*, 231 Cal. App. 4th 414, 425 (2014) (emphasis

16 added); *see also Hamilton v. Maryland Cas. Co.*, 27 Cal. 4th 718, 724-25 (2002)

17 ("California courts have derived an implied duty on the part of the insurer to accept

18 ***reasonable*** settlement demands on such claims within the policy limits.") (emphasis

19 added).

20    <u>Second</u>, the plaintiff must show that "the insurer ***unreasonably*** failed to

21 accept an otherwise reasonable offer within the time specified by the third party for

22 acceptance."  *Graciano*, 231 Cal App. 4th at 426 (emphasis added); *see also Pinto v.*

23 *Farmers Ins. Exch.*, 61 Cal. App. 5th 676, 276 Cal. Rptr. 3d 13, 21 (2021) ("To hold

24 an insurer liable for bad faith in failing to settle a third party claim, the evidence

25 must establish that the failure to settle was ***unreasonable***") (emphasis added);

26 *Hamilton*, 27 Cal. 4th at 724-25.

27

28

**B.    The Court can determine reasonableness as a matter of law**

While reasonableness may often be a question of fact, it "becomes a question of law where the evidence is undisputed and but one inference can be drawn from the evidence." *Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.*, 90 Cal. App. 4th 335, 346 (2001) (affirming summary judgment based on a determination that the insurer acted reasonably as a matter of law); *Carlton v. St. Paul Mercury Ins. Co.*, 30 Cal. App. 4th 1450, 1456 (1994) (same).

Thus, in bad faith refusal to settle cases, courts have repeatedly decided reasonableness as a matter of law. *E.g.*, *Pureco v. Allstate Indem. Co.*, 817 F. App'x 398 (9th Cir. 2020) (affirming summary judgment and holding as a matter of law that insurer acted reasonably); *McDaniel v. Gov't Employees Ins. Co.*, 681 F. App'x 614 (9th Cir. 2017) (same); *Grayson v. Allstate Ins. Co.*, 650 F. App'x 320, 320 (9th Cir. 2016) (same); *Coe v. State Farm Mut. Auto. Ins. Co.*, 66 Cal. App. 3d 981, 993-994 (1977) (holding as a matter of law that settlement offer was not reasonable); *Graciano*, 231 Cal. App. 4th at 434-35 (holding as a matter of law that the insurer acted reasonably); *Camelot by the Bay Condo. Owners' Assn. v. Scottsdale Ins. Co.*, 27 Cal. App. 4th 33, 54-55 (1994) (same).

Here, there is no dispute about the facts surrounding Galvez's demands and Allstate's responses to them.  Based on these undisputed facts, and for the reasons discussed below, Firchow's bad faith claim fails as a matter of law.

**C.    Galvez's demands were not reasonable**

Galvez's demands were not reasonable for several reasons, any one of which entitles Allstate to judgment as a matter of law.

**1.    The first demand did not provide information showing that an excess judgment was likely**

A policy limit demand is reasonable only when, at the time of the demand, "there is a substantial likelihood of a recovery in excess of [the policy] limits." *Johansen v. Cal. State Auto Ass'n Inter-Ins. Bureau*, 15 Cal. 3d 9, 16

1   (1975).  *See also Highlands Ins. Co. v. Cont'l Cas. Co.*, 64 F.3d 514, 517 (9th Cir.

2   1995) ("An offer of settlement within policy limits is reasonable when there is a

3   substantial likelihood that a jury verdict will be beyond those limits.").

4         The limited information provided with Galvez's November 2015 demand was

5   that she (1) sustained a scraped and bruised knee, (2) fractured her ankle and had

6   surgery on it, (3) was discharged the following day, (4) had only two sessions of

7   physical therapy, and (5) was "recovering well."  (JA 267 (Legrand Decl. ¶ 7); JA

8   45, 58, 62, 95-96, 209 (Ex. 4) (D12-13))  The incomplete information included with

9   the demand did not show that the claim was worth the $100,000 policy limit.  In

10  fact, the assigned adjuster had previously adjusted numerous broken ankle claims

11  that were resolved for less than $100,000.  (JA 267 (Legrand Decl. ¶ 7) (D18))  In

12  order to determine whether Galvez's damages would justify a policy limit

13  settlement, Allstate needed to know the amount of her medical bills, as well as to

14  what extent she would need further treatment in the future.  The demand, however,

15  did not include *any* information about Galvez's medical expenses, whether she was

16  insured (insurance reductions would also reduce the amount of recoverable medical

17  expenses), or whether she had complications after her ankle surgery and/or needed

18  further medical treatment beyond usual and customary follow-up appointments with

19  her doctor and potentially some physical therapy.  And Galvez did not provide the

20  signed medical and wage authorizations Allstate requested, which would have

21  allowed Allstate to obtain this information itself.

22        Because the limited information provided with the demand showed what

23  appeared to be a speedy recovery with no complications, and contained no

24  information whatsoever on her medical expenses, there was no indication that a

25  judgment above $100,000 was *substantially likely*.  Attorney Joy implicitly

26  acknowledged this when he later sent the medical bills – which Allstate had

27  requested all along – and renewed the demand.

28

### 2. The demands did not give Allstate enough time to evaluate Galvez's claim

As a matter of law, a settlement demand is also unreasonable if it does not give an insurer "an adequate opportunity to investigate and evaluate its insured's exposure." *Graciano*, 231 Cal. App. 4th at 425. This rule exists, in part, because courts recognize that short-fuse demands are often attempts to *avoid* settlement in order to set up a more lucrative bad faith claim. *See White v. Western Title Ins. Co.*, 40 Cal. 3d 870, 900 n.2 (1985) (Kaus, J., concurring and dissenting) ("It seems to me that attorneys who handle policy claims against insurance companies are no longer interested in collecting on those claims, but spend their wits and energies trying to maneuver the insurers into committing acts which the insureds can later trot out as evidence of bad faith."). That is precisely what happened here.

The Dominguez Firm made the November 2015 demand only about a month after the accident, and gave Allstate only a 24-day deadline from Allstate's receipt. But it did not provide any medical bills establishing Galvez's costs or any records indicating that Galvez needed further medical treatment beyond usual and customary follow-up appointments with her doctor and potentially some physical therapy. And the Firm refused to provide the medical and wage authorizations that Allstate requested, which would have allowed Allstate, itself, to obtain those records. Finally, Allstate followed the demand letter's instruction to the letter by writing to the Firm to request an extension and advise that, in order to fairly evaluate the claim, it needed to know (i) the amount of the medical bills and (ii) whether Galvez received further treatment during recovery. But rather than granting an extension, or even disclosing that the Firm would not grant it, the Firm ignored Allstate's request until the deadline expired. Thus, Allstate had *no* opportunity to obtain the critical records needed to evaluate the claim, much less an adequate one.

The January 6, 2016 demand – with its 3 business day from receipt deadline – also did not give Allstate an adequate opportunity to evaluate the claim. Courts

1  around the country recognize that an insurer's failure to meet an arbitrary or

2  unreasonably short settlement deadline does not expose an insurer to bad faith

3  liability, and have held even much longer deadlines to be unreasonable.[1]

4       Here, Galvez's short-fuse deadline was both arbitrary and unreasonable.  It

5  was arbitrary because the undisputed facts show there was no good reason why

6  Galvez needed Allstate to tender the limit by January 13, 2016, as opposed to two

7  days or even a week later.[2]  It was unreasonable because, even if there had been a

8  good reason for the January 13 deadline, a five-day (three business days) from

9  receipt deadline to complete evaluation of a claim is unreasonably short.

10      For this additional reason, Galvez's demands were not reasonable, and

11 Allstate cannot be liable for failing to accept them.

12     **D.**    **Allstate did not unreasonably refuse to settle**

13      The undisputed facts also demonstrate that Allstate did not unreasonably

14 reject the demand.  This is another reason why Allstate cannot be liable for bad

15 faith.

---

[1] *See, e.g.*, *Glenn v. Fleming* (Kan. 1990) 799 P.2d 79, 86 (14-day deadline); *Rogers v. Gov't Employees Ins. Co.* (La. Ct. App. 1992) 598 So.2d 670, 673 (5-day deadline); *Am. Mut. Ins. Co. of Boston v. Bittle* (Md. Ct. Spec. App. 1975) 338 A.2d 306, 308-309 (28-day deadline eventually extended to 53-day deadline); *Clauss v. Fortune Ins. Co.* (Fla. Ct. App. 1988) 523 So.2d 1177, 1178-79 (20-day deadline eventually extended to 30-day deadline); *see also AAA Nevada Ins. Co. v. Vinh Chau*, 808 F.Supp. 2d 1282, 1286-88 (arbitrary 14-day deadline).

[2] *See, e.g.,*, *Wiebe v. Hicks* (Kan. App. 2008) 2008 WL 4291641, at *7 (affirming trial court's legal conclusion insurer did not act in bad faith where trial court found that Wiebe's deadline was "completely arbitrary" and noted that Wiebe offered no evidence as to the significance of the deadline, there was no statute of limitations issue, no evidence of trial preparation or investigation taking place between May 31 and June 13, and that Wiebe offered no "legitimate reason why the policy limits offer which was acceptable to plaintiff on May 31, 2003, could not have been equally acceptable on June 13, 2003.")

### 1. Allstate did not refuse to settle at all

The California Supreme Court has repeatedly stated that an insurer's potential liability for a verdict in excess of policy limits is triggered only if it unreasonably *refuses* to settle within policy limits. *Hamilton*, 27 Cal. 4th at 725 ("An *unreasonable refusal* to settle may subject the insurer to liability for the entire amount of the judgment rendered against the insured, including any portion in excess of the policy limits") (emphasis added); *Kransco v. Intl. Ins. Co.*, 23 Cal. 4th 390, 401 (2000) ("An insurer that breaches its implied duty of good faith and fair dealing by *unreasonably refusing* to accept a settlement offer within policy limits may be held liable for the full amount of the judgment against the insured in excess of its policy limits."); *Commercial Union Assur. Cos.* v. *Safeway Stores, Inc.*, 26 Cal. 3d 912, 916-17 (1980) ("[A]n insurer may be held liable for a judgment against the insured in excess of its policy limits where it has breached its implied covenant of good faith and fair dealing by *unreasonably refusing* to accept a settlement offer within the policy limits.").

Here, Allstate did not refuse to settle at all.  Rather, it responded to the first demand by following the demand letter's express instruction – requesting an extension in writing – and explaining that, in order to fairly evaluate the claim, it needed to know (i) the amount of the medical bills and (ii) whether Galvez received further treatment during recovery.  *See Critz v. Farmers Ins. Grp.*, 230 Cal. App. 2d 788, 798 (1967) ("Had the company needed more time for investigation, for a good faith assessment of the claim's value or for consultation with its policyholder, it might have chosen neither to accept nor reject her offer, but rather to suggest additional time" ); *Graciano*, 231 Cal. App. 4th at 425.  And once it became aware of the second demand, Allstate offered the policy limit less than 48 hours after the short-fuse deadline expired – and that is only because Joy refused to extend it.  Thus, Allstate did not refuse to settle.  *See Grayson v. Allstate Ins. Co.*, 650 F. App'x 320, 320 (9th Cir. 2016) (holding that an insurer who inadvertently

1   rejected a settlement demand by sending an overly broad release, did not

2   unreasonably refuse to settle).

3               **2.      Allstate did not *unreasonably* refuse to settle**

4          Bad faith liability requires unreasonable conduct.  And mere negligence or

5   clerical errors do not constitute bad faith.  As the California Supreme Court

6   explained, bad faith is comprised of conduct:

7          ***prompted not by an honest mistake, bad judgment or negligence but***

8          ***rather by a conscious and deliberate act***, which unfairly frustrates the

9          agreed common purposes and disappoints the reasonable expectations

10         of the other party thereby depriving that party of the benefits of the

11         agreement.

12  *Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th 713, 726 (2007) (italics added).  *See*

13  *also Pinto v. Farmers Ins. Exch.*, 61 Cal. App. 5th 676, 276 Cal. Rptr. 3d 13, 21

14  (2021) ("[M]ere errors by an insurer in discharging its obligations to its insured does

15  not necessarily make the insurer liable in tort for violating the covenant of good

16  faith and fair dealing; to be liable in tort, the insurer's conduct must also have

17  been *unreasonable*.") (quoting *Graciano*, 231 Cal. App. 4th at 425 (italics

18  original)); *Walbrook Ins. Co. v. Liberty Mut. Ins. Co.*, 5 Cal. App. 4th 1445, 1460

19  (1992) ("[S]o long as insurers are not subject to a strict liability standard, there is

20  still room for an honest, innocent mistake."); *Brown v. Guarantee Ins. Co.*, 155 Cal.

21  App. 2d 679, 689 (1957) ("negligence alone is insufficient to render the insurer

22  liable" for the failure to settle).  Thus, when an insurer's failure to effectively accept

23  a settlement offer is not due to a conscious or deliberate act, but is instead the result

24  of negligence, the insurer is *not* liable for bad faith.

25         *Pureco v. Allstate Indem. Co.*, 817 F. App'x 398 (9th Cir. 2020) is on point.

26  There, an attorney tried a similar maneuver.  Despite Allstate's requests, he withheld

27  critical medical information.  Later, he provided the missing information, but with a

28  short-fuse deadline, which expired while the adjuster was out.  The next day the

adjuster saw the demand and offered the policy limit.  The Ninth Circuit ruled that, as a matter of law, Allstate did not unreasonably refuse to settle:

> From the moment Allstate received the policy-limits demand, it asked Andrew Zeytuntsyan, who represented Pureco, for more information about Pureco's injuries, but he failed to provide it until late on the Friday afternoon preceding the Monday deadline. There is evidence that suggests that Zeytuntsyan knew the Allstate agent was not in the office at that time and would not be in the office on Monday. Even if Zeytuntsyan did not know that the agent would be out, ***Allstate's failure to evaluate the additional material until Tuesday morning was at most negligence, not "a conscious and deliberate act,*** which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party.

*Id*. at 401.

The Ninth Circuit ruled the same way in *McDaniel v. Gov't Employees Ins. Co.*, 681 F. App'x 614 (9th Cir. 2017).  There, the claimant made a policy limit demand and agreed to extend the deadline until 10 days after he provided responses to interrogatories.  The insurance adjuster, however, inadvertently did not read an email notifying him that the interrogatory responses had been received.  Therefore, the insurer did not offer the policy limit until *25 days* after the deadline had passed, and the claimant rejected the offer.  681 F. App'x at 616-617.  The Ninth Circuit, however, ruled that the clerical error by the adjuster could not support a bad faith failure to settle claim:

> In the absence of evidence that establishes that GEICO intentionally allowed the September 6, 2009 deadline to lapse, no reasonable jury could conclude that GEICO's failure to accept the settlement offer on or before the September 6, 2009 was "a calculated gamble on which only its insured could lose." *Allen v. Allstate Ins. Co*., 656 F.2d 487,

490 (9th Cir. 1981).  Instead, the facts conclusively establish that GEICO both wanted and attempted to accept McDaniel's settlement offer, but failed to discover the September 6, 2009 deadline because of [the adjuster's] negligence.  ***But, as discussed above, an insurer's negligence is insufficient to constitute an "unreasonable refusal" to accept a settlement offer***.  Accordingly, no reasonable jury could conclude that GEICO unreasonably refused to settle.

*Id.* at 617.  Therefore, the Ninth Circuit ordered the district court to enter summary judgment for the insurer.  *Id.* at 618; *see also Grayson*, 650 F. App'x at 320.

These Ninth Circuit holdings simply applied established California law.  *See Pinto*, 61 Cal. App. 5th 676, 276 Cal. Rptr. 3d at 21; *Walbrook*, 5 Cal. App. 4th at 1460; *Graciano*, 231 Cal. App. 4th at 425; *see also Aceves v. Allstate Ins. Co.*, 68 F.3d 1160, 1166 (9th Cir. 1995) ("In California, mere negligence is not enough to constitute unreasonable behavior for the purpose of establishing a breach of the implied covenant of good faith and fair dealing in an insurance case."); *Tento Int'l, Inc. v. State Farm Fire & Cas. Co.*, 222 F.3d 660, 664 (9th Cir. 2000) (same). These rulings are also in accord with rulings from courts across the country, which recognize that clerical errors, mis-filed documents, and other negligent mistakes are insufficient to support a bad faith claim.[3]

_____

[3] *See Roberts v. Printup*, 422 F.3d 1211, 1219 (10th Cir. 2005) (failure to settle because of clerical error not bad faith); *Cornerstone Nat. Ins. Co. v. Itule*, 2014 WL 4897364, at *4 (D. Ariz. Sept. 30, 2014) (holding insurer's inadvertent clerical error in third party bad faith failure to settle case did "not rise to the level of bad faith" where insurer "attempted to settle for the policy limits with [claimant] on the deadline of [claimant's] demand, but failed to provide an actual check for the policy limits that day … [but] provided the check the next day") (citing *Miel v. State Farm Mut. Auto. Ins. Co.*, 185 Ariz. 104, 110 (Ct. App. 1995)); *Dean v. Foremost Affiliated Ins. Servs.*, 2011 WL 1863283, at *3 (Ariz. Ct. App. May 10, 2011) ("Negligence in the form of mere mistakes, inadvertence, loss of papers, and misfiling of documents is insufficient to establish an insurance bad faith claim.");

-17-

The Ninth Circuit holdings also reflect another principle of California insurance law: "an injured third party's unilateral selection of a deadline does not conclusively govern whether a *later* tender of policy limits would have been *untimely*." *Graciano*, 231 Cal. App. 4th at 435 (emphasis original); *see also Boicourt v. Amex Assurance Co*., 78 Cal. App. 4th 1390, 140 (2000) ("[T]he fact that Amex later *did* tender policy limits after litigation commenced still might serve as the basis for a complete defense of *this* bad faith suit.  A *timely* settlement offer by a liability insurer does preclude a bad faith action.") (emphasis original); *Martin v. Hartford Acc. & Indem. Co.*, 228 Cal. App. 2d 178, 185 (1964) (An insurer "need not be governed by whatever time limit [for settlement] counsel for plaintiff in a personal injury action may impose.").

Here, then, where: (i) Allstate had only 3 business days from its receipt to respond to the demand before it expired, (ii) the adjuster was on vacation until the deadline expired, (iii) upon learning of the demand – only 15 minutes after the demand expired – she asked for, but was refused, an extension, and (iv) Allstate nevertheless evaluated the new information and tendered the policy limit *less than 48 hours* later, Allstate did not unreasonably refuse to settle.

**E.    Allstate paid 17 times the limit to satisfy the judgment**

In every one of the bad faith refusal to settle cases cited in this brief, the parties argued over whether the insurer *should be liable* for an excess judgment.  In none of those cases, did the insurer actually pay more than its limit to satisfy the excess judgment.  But that is exactly what Allstate did here.

---

*Rawlings v. Apodaca*, 151 Ariz. 149, 157 (Ct. App. 1986) ("Insurance companies, like other enterprises and all human beings, are far from perfect. Papers get lost, telephone messages misplaced and claims ignored because paperwork was misfiled or improperly processed. Such isolated mischances may result in a claim being unpaid or delayed. None of these mistakes will ordinarily constitute a breach of the implied covenant of good faith and fair dealing."); *Prudential Ins. Co. of Am. v. Coleman*, 428 So. 2d 593, 599 (Ala. 1983) (denial caused by internal mistake not bad faith).

For all of the reasons explained above, Allstate was not liable for the excess judgment.  Nevertheless, to protect Firchow, Allstate paid $1.75 million – 17 times the policy limit – to satisfy  Galvez's judgment and obtain a complete release of Firchow.  Thus, Allstate fulfilled the precise goal that bad faith law was designed to achieve – it protected Firchow from any personal liability.  Put simply, that's not bad faith; it's good faith.

## IV.   <u>FIRCHOW'S BREACH OF CONTRACT CLAIM LACKS MERIT</u>

Firchow's breach of contract claim is substantively the same as his bad faith claim, just with a different name.  Firchow again alleges that Allstate refused to accept a reasonable settlement offer, resulting in trial and an excess judgment.  And again, this claim fails as a matter of law.

First, a breach of contract claim can be based only on a breach of the insurer's *express* obligations under the insurance contract – the duty to defend and indemnify. The duty to settle, however, is not an express obligation.  Rather, "[a]n insurer's liability for failing to accept a reasonable settlement offer 'is imposed not for a bad faith breach of the contract but for failure to meet the duty to accept reasonable settlements, *a duty included within the implied covenant of good faith and fair dealing.*'"  *Archdale v. Am. Internat. Specialty Lines Ins. Co.*, 154 Cal. App. 4th 449, 465-66 (2007) (citing *Crisci v. Security Ins. Co*, 66 Cal 2d 425, 430 (1967)) (italics in original).

Therefore, as the California Court of Appeals explained in *Archdale*, an alleged failure to settle cannot give rise to a cause of action for breach of contract:

> Plaintiffs have alleged two causes of action, one for breach of contract and one for breach of the implied covenant of good faith and fair dealing. The first cause of action necessarily relates only to the express promises made by [the insurer] in its policy, that is, to defend the underlying action and to provide indemnity to the extent of its policy limits. The record reflects, without dispute, that [the insurer] performed

1  both of those contractual commitments. ***As a result, there is no factual***

2  ***or legal basis for the breach of contract claim asserted in the***

3  ***plaintiffs' first cause of action***.

4  *Archdale*, 154 Cal. App. 4th at 466 (emphasis added).

5  As in *Archdale*, Allstate provided a defense to Firchow against Galvez's

6  lawsuit.  Moreover, after the verdict, Allstate went far beyond its contractual

7  obligations: rather than merely paying the $100,000 policy limit – the extent of its

8  obligations – Allstate also paid $1.75 million in settlement of the excess judgment.

9  Thus, Allstate fulfilled all of its express contractual obligations under the policy

10  (and more) and cannot be liable for breach of contract.

11  Second, even if a failure to settle allegation could theoretically support a

12  cause of action for breach of contract, that claim fails here for the same reasons that

13  the bad faith claim fails: the demand was not reasonable, and Allstate acted

14  reasonably.

15  **V.    THE CLAIM FOR PUNITIVE DAMAGES CANNOT SURVIVE**

16  Firchow's punitive damages claim fails as a matter of law.  Simply put, there

17  is no evidence – let alone clear and convincing evidence – to support it.

18  Several standards regarding punitive damages apply here.  First, to recover

19  punitive damages, plaintiffs must provide clear and convincing evidence of fraud,

20  oppression or malice.  Cal. Civ. Code § 3294.

21  • "Fraud" is "an intentional misrepresentation, deceit or concealment of a

22  material fact known to the defendant with the intention on the part of

23  the defendant of thereby depriving a person of property or legal rights

24  or otherwise causing injury."  Cal. Civ. Code § 3294(c)(3).

25  • "Oppression" means "despicable conduct that subjects a person to cruel

26  and unjust hardship in conscious disregard of the person's rights."  Cal.

27  Civ. Code § 3294(c)(2).  "Despicable conduct" is conduct "so vile,

28  base, contemptible, miserable, wretched or loathsome that it would be

looked down upon and despised by ordinary decent people." *Stewart v. Truck Ins. Exch.*, 17 Cal. App. 4th 468, 483 n. 29 (1993).

- "Malice" means either (1) "conduct which is intended by the defendant to cause injury to the plaintiff" or (2) "despicable conduct which is carried on by the defendant with a willful and conscious disregard for the rights or safety of others." Cal. Civ. Code § 3294(c)(1). "Evil motive is the central element of the malice which justifies an exemplary award." *O'Hara v. Western Seven*, 75 Cal. App. 3d 798, 806 (1977).

Second, on summary judgment, the court must test a punitive damages claim under the heightened "clear and convincing evidence" standard. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 254 (1986) ("in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden"); *Food Pro Internat., Inc. v. Farmers Ins. Exch.*, 169 Cal. App. 4th 976, 994 (2008) (applying same standard and quoting *Liberty Lobby*, 411 U.S. at 254–55). Thus, to survive summary judgment, plaintiffs must present evidence for punitive damages that is strong enough to command "the unhesitating assent of every reasonable mind." *In re Angelia P.*, 28 Cal. 3d 908, 919 (1981).

Third, "the evidence required to support an award of punitive damages for breach of the implied covenant of good faith and fair dealing is 'of a different dimension' from that needed to support a finding of bad faith." *Shade Foods, Inc. v. Innovative Prods. Sales & Mktg.*, 78 Cal. App. 4th 847, 909-10 (2000) (citation omitted). Evidence of bad faith – without more – does not support a claim for punitive damages. *Beck v. State Farm,* 54 Cal. App. 3d 347, 355-56 (1976); *Stewart*, 17 Cal. 4th at 483.

Fourth, the evidence must not be merely consistent with the theory of oppression, fraud, or malice. Rather, Firchow must produce evidence that is inconsistent with any other explanation: "some evidence should be required that is

-21-

1  inconsistent with the hypothesis that the tortious conduct was the result of a mistake

2  of law or fact, honest error of judgment, over-zealousness, mere negligence or other

3  such non-iniquitous human failing." *Tomaselli v. Transamerica Ins. Co*., 25 Cal.

4  App. 4th 1269, 1287-88 n. 14 (1994).

5      <u>Finally</u>, a plaintiff seeking punitive damages against a corporation must show

6  by clear and convincing evidence that the act constituting malice or oppression was

7  committed or ratified by an "officer, director, or managing agent." *Cruz v.*

8  *HomeBase*, 83 Cal. App. 4th 160, 163 (2000); *White v. Ultramar, Inc*., 21 Cal. 4th

9  563, 572-77 (1999).

10     Here, Firchow cannot meet these stringent standards.  The undisputed

11 evidence shows that Allstate not only tried to settle Galvez's claim to protect

12 Firchow, but that Allstate also *did, in fact*, protect Firchow by paying the excess

13 judgment against him.  There is no evidence – much less clear and convincing

14 evidence – of malice, oppression, or fraud.  Nor is there any evidence of ratification

15 of such conduct by a managing agent.  Therefore, the Court should dismiss the

16 punitive damages claim.

17 **VI.   CONCLUSION**

18     The Court should grant summary judgment for Allstate.

19 **VII.   FIRCHOW'S INTRODUCTION**

20     This case arises from the unreasonable refusal of defendant Allstate

21 Northbrook Ins. Co. ("Allstate") to settle a serious personal injury claim against its

22 insured, plaintiff Robert Firchow, for the $100,000 limits of Firchow's insurance

23 policy. The claimant, 18-year-old Celeste Galvez, suffered a life-altering

24 comminuted fracture of her left ankle and was hospitalized for three days after

25 Firchow made a left turn and struck her as she was in a crosswalk on October 23,

26 2015. Firchow was intoxicated at the time of the accident. He was arrested, served

27 four days in jail and later pled no contest to felony DUI.

28

1   Ms. Galvez's attorney, Matthew Joy of the well-known personal injury firm

2   The Dominguez Firm, on November 20, 2015, wrote to Allstate with an offer to

3   settle the case for the policy limits of Mr. Firchow's insurance. Included with the

4   letter were the police report that concluded that Mr. Firchow was guilty of DUI,

5   along with 181 pages of medical records from Kaiser detailing the treatments and

6   medications Ms. Galvez received during her three-day hospital stay. Those

7   treatments included an open reduction and internal fixation surgery in which four

8   screws were placed in her left ankle to hold it together. The Kaiser records showed

9   that Ms. Galvez, listed as 5'7" and 267 pounds, had been discharged with a

10  wheelchair and a walker, told that she could not put weight on her left ankle for

11  several weeks, and informed that she would need physical therapy once her bones

12  had healed.

13      The letter stated the demand would expire on December 21, 2015, at 5:00

14  p.m. Allstate admits to receiving the letter by November 27, 2015. Allstate's records

15  show that by December 3, 2015, it had determined that Firchow was 100% at fault

16  for the accident. Allstate also knew the case was an "aggravated" one because of

17  Firchow's intoxication, which, should there ever be a trial, would likely lead a jury

18  to award Ms. Galvez more in general damages than it would otherwise. Allstate also

19  knew that there was a significant likelihood that Ms. Galvez would later require

20  surgery to have the screws in her ankle removed or replaced.

21      Cathy Legrand, an Allstate adjuster with more than 20 years of experience

22  who was handling the claim, was skeptical of the policy limits demand; she both

23  testified in deposition and in her declaration supporting Allstate's motion that she

24  had previously settled broken ankle claims for less than $100,000. Her apparent

25  determination to maintain that record with the Galvez claim informed Allstate's

26  investigation of the claim, or lack thereof, and its unreasonable failure to settle.

27      On December 15, 2015, Legrand wrote Galvez's counsel to ask for an

28  extension of time to respond to the policy limits demand, stating that Allstate needed

1    more information to evaluate it. Legrand did not, however, make any attempt to use

2    Allstate's own resources, such as records of other claims where a claimant had

3    undergone an open reduction and internal fixation surgery on a broken ankle, to

4    attempt to determine at least a range of what Ms. Galvez's medical expenses might

5    be. Allstate also did not use the "Colossus" system, to which it had access, to

6    attempt to generate an estimate of the value of Galvez's claim.

7        Also on December 15, 2015, Legrand wrote Firchow to inform him that a

8    policy limits demand had been made. The letter noted that Firchow could, if the

9    claim settled for more than the policy limits, make a contribution to the settlement

10   out of his personal funds. It closed by stating "we will continue to work to resolve

11   this case and protect your interest to the best of our ability."

12       However, after December 15, 2015, there is no evidence that Allstate did any

13   work on the claim at all until January 11, 2016. Allstate also did not follow up with

14   Galvez's counsel to see if its request for an extension had been accepted but was,

15   apparently, content to let the demand expire with no further action on its part.

16       On January 6, 2016, attorney Joy sent a second policy limits demand to

17   Allstate. The one-page letter stated the demand would expire in seven days, i.e., on

18   January 13, 2016. Accompanying the letter were records showing that Galvez had

19   $59,863.20 in medical bills.

20       Allstate's records indicate it received the letter on January 8, 2016, a Friday.

21   On the following Monday, January 11, 2016, Allstate "evaluation consultant"

22   Vickie Hubbell – a senior adjuster tasked with reviewing claims and assisting the

23   adjusters to whom they were assigned – noted receipt of the medical billing records.

24   Hubbell put the letter and the bills in Legrand's inbox, but overlooked the one-week

25   time limit on the policy limits demand.

26       Legrand, who had been out of the office, returned on January 13, 2016 but has

27   testified that she did not see the demand letter or medical records. She had a "desk

28   partner" who was supposed to have noted any incoming items that required an

1  urgent response, but there is no record of the "desk partner" having seen the demand

2  letter.

3          Shortly after 5 p.m. on January 13, 2016, attorney Joy called Legrand and

4  informed her that the offer to settle the case for the policy limits had expired and

5  that no extension would be granted.

6          On January 14, 2016, Legrand wrote Firchow, again, that there was a policy

7  limits demand on the claim, but did not inform him the demand had expired. Also

8  on January 14, 2016, Allstate obtained two Colossus reports that estimated a

9  settlement value of the Galvez claim at between $62,930 and $69,900. However,

10 both reports showed no information had been input for the "Alcohol/Drugs

11 Involved" category, meaning neither report took Firchow's DUI into account.

12         On January 15, 2016, Galvez filed a personal injury action against Firchow in

13 Los Angeles Superior Court. On the same day, Allstate finally offered to settle the

14 claim for the policy limits, but Galvez did not accept.

15         Allstate assigned the defense of Firchow to the firm of McClaughtery &

16 Associates, which initially informed Allstate that Ms. Galvez was likely to obtain a

17 verdict in excess of the $100,000 policy limits and, in subsequent reports, raised its

18 estimate of the verdict to approximately $200,000 and eventually to more than $1

19 million. Despite these reports, Rosie Arambula, who took over the claim after

20 litigation was filed, testified she was not aware of Allstate offering more than the

21 policy limits after litigation commenced.   On May 23, 2019, a jury returned a

22 verdict in favor of Ms. Galvez for $2,427,015, more than 24 times the amount that

23 Allstate could have settled the case for on January 13, 2016.

24         On February 20, 2020, Allstate finally settled the case, paying Ms. Galvez a

25 total of $1.85 million. By that time, Mr. Firchow had endured more than four years

26 of stress and anxiety that could have entirely been avoided had Allstate settled the

27 claim for the policy limits.

28

## VIII. PLAINTIFF'S UNDISPUTED FACTS

In addition to the facts proffered by defendant, plaintiff offers the additional undisputed facts.

Galvez was admitted to the Kaiser hospital in Downey on October 23, 2015, the evening of the accident. She was diagnosed with a comminuted fracture of the talus of her left ankle.  (Brandt Dec., ¶ 3; JA 281, 285-286 (Exh. 19) (P1).  Galvez underwent surgery for her broken left ankle on October 24, 2015.  (Brandt Dec., ¶ 3); JA 287-291 (Exh. 19)(P2).

The surgery was an open reduction and internal fixation of Galvez's left talus. Surgeon Dr. Robert Sundstrom placed three metal screws in the ankle. (Brandt Dec., ¶ 3, JA 287-291 (Exh. 19) (P3).  The hospital records listed Galvez's height as 5'7" and weight as 267 pounds. (JA 103 (Exh. 4, (P4)

Galvez was discharged from the hospital on October 26, 2015.  (Brandt Dec., ¶ 3, JA 292-293 (Exh. 19) (P5).  The discharge instructions noted that Galvez would require physical therapy but would not be able to begin it until her bones had healed. (Brandt Dec., ¶ 3, JA 293 (Exh. 19) (P6).  Galvez was discharged with a walker and a wheelchair. She was told not to put any weight on her left ankle for six weeks. . (Brandt Dec., ¶ 3, JA 95, 292-293 (Exhs. 4, 19. 19) (P7).  The Kaiser medical records showed Galvez had a followup appointment on November 4, 2015.  (Brandt Dec., ¶ 3, JA 292-293 (Exh. 19) (P8).

Cathy Legrand, the Allstate adjuster assigned to the claim, initially set a $25,000 reserve for the Galvez claim.  (Brandt Dec., ¶ 3, JA 330 (Exh. 20, (P9). Legrand had previously settled broken ankle claims for less than $100,000.  (Brandt Dec., ¶ 3, JA 340 (Exh. 21) (P10).

Galvez's attorney, Matthew Joy, believed the November 20, 2015 policy limits demand was a "no brainer" because of Firchow's DUI and 100% liability and the extent of Galvez's injuries. (Brandt Dec., ¶ 3, JA 354 (Exh. 24) (P11).

1   On December 3, 2015, Legrand determined that Firchow was 100% at fault

2   for the accident. (Brandt Dec., ¶ 3, JA 331, 342 (Exhs. 20, 21) (P12).  Legrand

3   believed Firchow's liability was "aggravated" because he had been driving drunk.

4   (Brandt Dec., ¶ 3, JA 341 (Exh. 21) (P13).

5   On December 15, 2015, Legrand wrote to Firchow that a policy limits

6   demand had been made by Galvez. The letter stated that Firchow could, if the claim

7   settled for more than the policy limits, make a contribution to the settlement out of

8   his personal funds. It closed by stating "we will continue to work to resolve this case

9   and protect your interest to the best of our ability." (Brandt Dec., ¶ 3, JA 294-295

10  (Exh. 19) (P14).

11  When Allstate wrote to the Dominguez firm on December 15, 2015, to ask for

12  an extension of the policy limit demand deadline of December 21, 2015, Allstate

13  knew that Ms. Galvez had been hospitalized for three days after the accident and

14  had undergone an open reduction and internal fixation surgery that resulted in metal

15  screws being placed in her ankle to hold it together.  (Brandt Dec., ¶ 3, JA 287-291,

16  292-293 (Exh. 19) (P15).

17  Allstate did not do any more work on the Galvez claim after December 15,

18  2015, until January 11, 2016. There is no record of Allstate attempting to follow up

19  with The Dominguez firm to see if the December 21, 2015, deadline to respond to

20  the policy limits demand had been extended.  (Brandt Dec., ¶ 3, JA 332-333 (Exh.

21  20)  (P16).

22  On January 11, 2016, Allstate "evaluation consultant" Vickie Hubbell noted

23  the receipt of two pages of records showing that Galvez had medical bills of

24  $59,862.20.  (Brandt Dec., ¶ 3, JA   333, 346 (Exhs. 20, 22) (P17).  Hubbell did not

25  notice the one-page policy limits demand letter dated January 6, 2016, that expired

26  on January 13, 2016. She left the letter and records in a box on Legrand's desk.

27  (Brandt Dec., ¶ 3, JA 333, 346 (Exhs. 20, 22) (P18).

28

1    Hubbell also believed Firchow's liability was aggravated because of the DUI,

2    which would lead a jury to award higher general damages than if Firchow had not

3    been drunk at the time of the accident.  (Brandt Dec., ¶ 3, JA 347 (Exh. 22) (P19).

4    Legrand, who had been out of the office, returned to work on January 13,

5    2016. She did not notice the demand letter on her desk.  Her "desk partner" did not

6    notify her of the demand letter.  (Brandt Dec., ¶ 3, JA 333, 340 (Exhs. 20, 21) (P20).

7    On January 14, 2016, Legrand felt "rattled" after having received the call

8    from Joy on January 13, 2016 and learning that the second policy limits demand had

9    expired.  (Brandt Dec., ¶ 3, JA 340, 343 (Exh. 21) (P21).

10   On January 14, 2016, Allstate obtained two "Colossus" reports on the Galvez

11   claim. These showed a settlement value of between $62,930 and $69,900. But

12   neither report accounted for the impact of Firchow's DUI because that was not put

13   into the Colossus system.  (Brandt Dec., ¶ 3, JA 296-300, 303-307 (Exh. 19) (P22).

14   After learning that the second policy limits demand had expired, Legrand and

15   Hubbell each recommended that Allstate offer the policy limits.  (Brandt Dec., ¶ 3,

16   JA 334-336 (Exh. 20) (P23).

17   On January 14, 2016, Legrand again wrote Firchow that a policy limits

18   demand had been made. The letter did not inform Firchow that the demand had

19   expired.  (Brandt Dec., ¶ 3, JA 301-302 (Exh. 19) (P24).

20   Rosie Arambula took over as the claims representative for Allstate on the

21   Galvez matter after Galvez's lawsuit against Firchow was filed.  (Brandt Dec., ¶ 3,

22   JA 337, 350 (Exhs. 20, 23) (P25).

23   McClaugherty & Associates, the law firm retained to represent Firchow, sent

24   Allstate several status reports on the case. A letter on May 10, 2016 estimated the

25   likely verdict for Galvez at $108,000. A letter on April 17, 2017 estimated the

26   verdict at between $185,000 and $235,000. A letter before trial on March 26, 2019

27   estimated the likely verdict at more than $1 million and up to $1.69 million.  (Brandt

28   Dec., ¶ 3, JA 308-328 (Exh. 19) (P26).

Arambula testified she was not aware of Allstate offering more than the policy limits before the trial of the lawsuit. (Brandt Dec., ¶ 3, JA 351 (Exh. 23) (P27).

## IX.   ALLSTATE HAS FAILED TO MEET ITS BURDEN OF PRESENTING FACTS THAT SUPPORT SUMMARY JUDGMENT

A.   <u>Legal Standards Governing Bad Faith Actions For Failure To Settle</u>

The legal principles that govern actions such as this, for an insurer's breach of the covenant of good faith and fair dealing by failing to accept a reasonable settlement offer, are well known. The court in *Madrigal v. Allstate Ins. Co.*, 215 F.Supp. 3d 870 (C.D. Cal. 2016), summed up its review of California and federal precedent thusly:

"The implied covenant requires an insurer to accept a reasonable third party offer to settle within policy limits against its insured. *Graciano v. Mercury General Corp.*, 231 Cal. App. 4th 414, 425, 179 Cal. Rptr. 3d 717 (2014); see also *DeWitt v. Monterey Ins. Co.*, 204 Cal. App. 4th 233, 236, 138 Cal. Rptr. 3d 705 (2012) (same). '[T]he breach of the insurer's obligation occurs at the time when it indulges in the unwarranted rejection of a reasonable compromise offer within the policy limits.' *Critz v. Farmers Ins. Group*, 230 Cal. App. 2d 788, 797, 41 Cal. Rptr. 401 (1964), disapproved on other grounds by *Crisci v. Security Ins. Co. of New Haven, Conn.*, 66 Cal.2d 425, 429–30, 58 Cal. Rptr. 13, 426 P.2d 173 (1967)). 'An insurer's 'good faith' is essentially a matter of fact.' *Allen v. Allstate Ins. Co.*, 656 F.2d 487, 489 (9th Cir. 1981) (as amended) (citing *Kinder v. Western Pioneer Ins. Co.*, 231 Cal. App. 2d 894, 900, 42 Cal. Rptr. 394 (1965)); see also *Critz*, 230 Cal. App. 2d at 796, 41 Cal. Rptr. 401 ('Good or bad faith is a question of fact in each case.').

"To prevail on a claim for breach of the implied covenant of good faith and fair dealing, an insured must show: (1) the claimant brought a claim against the insured that was covered by the insurer's policy; (2) the insurer failed to accept a reasonable settlement demand for an amount within policy limits; (3) the insurer's

1  failure to accept the settlement demand was unreasonable, which means without

2  proper cause; and (4) a monetary judgment was entered against the insured for a

3  sum greater than the policy limits. (CACI 2334, as revised 12/2015). The crux of a

4  bad faith claim is an 'unwarranted rejection of a reasonable settlement offer.' *Crisci*,

5  66 Cal. 2d at 430, 58 Cal. Rptr. 13, 426 P.2d 173. Factors that a jury may consider

6  in determining whether the offer to settle was reasonable include whether:

7      "(1) [the offer's] terms are clear enough to have created an enforceable

8  contract resolving all claims had it been accepted by the insurer, (2) all of the third

9  party claimants have joined in the demand, (3) it provides for a complete release of

10  all insureds, and (4) the time provided for acceptance did not deprive the insurer of

11  an adequate opportunity to investigate and evaluate its insured's exposure." (215

12  F.Supp. 3d at 887-88.)

13      The court in *Madrigal* noted that an insurer may not be liable for bad faith if

14  its refusal to accept a policy limits demand is the result of a mere mistake. But the

15  court also noted that the insured is not required to show "actual dishonesty, fraud, or

16  concealment" on the insurer's part. And, citing *McDaniel v. GEICO General Ins.*

17  *Co.*, 55 F.Supp. 3d 1244, 1262, (E.D. Cal., 2014), the court stated that if "an offer's

18  time limit is reasonable, and the settlement offer itself is otherwise reasonable, but

19  the insurer does not accept the offer within the time limit, then the insurer has

20  breached the covenant of good faith and fair dealing and cannot escape liability by

21  attempting to accept an expired or withdrawn offer." (See *Madrigal*, 215 F.Supp. at

22  888-89.)

23      Finally, as the California Supreme Court stated in *Crisci*, *supra*, "[t]he size of

24  the judgment recovered in the personal injury action … although not conclusive,

25  furnishes an inference that the value of the claim is the equivalent of the amount of

26  the judgment and that acceptance of an offer within those limits was the most

27  reasonable method of dealing with the claim." (66 Cal.2d at 431.)

28

B.  Summary Judgment Should Be Denied When The Evidence Permits

Conflicting Factual Inferences

As noted, the question of whether an insurer unreasonably failed to accept a

policy limits offer is an issue of fact. *Allen v. Allstate Ins. Co.*, 656 F.2d 487, 489

(9th Cir. 1981) An insurer is not entitled to judgment as a matter of law where,

viewing the facts in the light most favorable to the plaintiff, a jury could conclude

that the insurer acted unreasonably. *Amadeo v. Principal Mut. Life Ins. Co.* (9th

Cir.2002) 290 F.3d 1152, 1161–1162.

C.  Both Of Galvez's Settlement Demands Were Reasonable And Should

Have Been Accepted

Galvez made two demands, on November 20, 2015 and on January 6, 2016, to

settle her claim against Firchow for the policy limits. Both demands were

reasonable, and should have been accepted by Allstate, because at the time they

were made it was clear there was a substantial likelihood that Galvez would obtain a

judgment in excess of $100,000 against Firchow should the claim go into litigation.

Allstate had ample information to warrant accepting the first demand before it

expired on December 21, 2015, and even more information to warrant accepting the

second demand before it expired on January 13, 2016.

1.  The November 20, 2015, Settlement Demand Was Reasonable

Defendant's moving papers, in describing the November 21, 2015, demand

state that the only information it provided was that Ms. Galvez had "(1) sustained a

scraped and bruised knee, (2) fractured her ankle and had surgery on it, (3) was

discharged the following day, (4) had only two sessions of physical therapy, and (5)

was 'recovering well.'" This description of the demand is a gross

mischaracterization.

First, the demand letter stated, and the Kaiser records that accompanied it

showed, that Galvez was hospitalized on October 23, 2015, underwent surgery on

1  October 24, 2015, and was not discharged until October 26, 2015, not "the
2  following day" as stated by defendant.

3       The demand letter also stated, and the Kaiser records showed, that Ms. Galvez
4  had suffered a comminuted fracture of the talus, meaning the bone had broken in
5  more than three places. The ankle surgery she then underwent was an "open
6  reduction and internal fixation," in which three metal screws were placed to hold the
7  repaired ankle together.

8       The Kaiser records further showed that Ms. Galvez received two sessions of
9  physical therapy while at the hospital, and was advised upon discharge that she
10 would require more physical therapy, but that it could not begin until her bone had
11 healed sufficiently. She was given a wheelchair, a walker and a raised commode
12 seat at discharge, and advised not to put any weight on her lower left extremity for
13 six weeks. The records listed Ms. Galvez as 5'7" and 267 pounds.

14      Allstate's motion focuses on the fact that the initial demand letter did not
15 include the medical bills showing the charges for the services Ms. Galvez received.
16 However, Allstate also recognized, as evaluation consultant Vickie Hubbell later
17 noted in the claims log, that because Ms. Galvez was young – 18 years old at the
18 time of the accident – and had had three screws placed in her ankle, there was a
19 substantial possibility that she would have to undergo an additional surgery to have
20 the screws removed or replaced.

21      Legrand also quickly determined from the Traffic Collision Report  enclosed
22 with the demand that Firchow was not only 100% at fault for the accident -- he
23 struck Ms. Galvez as she was crossing the street in the crosswalk and on a green
24 light -- but that the case was an "aggravated" one because Firchow had been arrested
25 for DUI after a breathalyzer test showed his blood alcohol level was 0.15%, or
26 nearly twice the legal limit.

27      LeGrand was not the only Allstate employee to recognize the likely effect of
28 the DUI arrest on a possible judgment against Firchow. Vickie Hubbell was an

-32-

Allstate "Evaluation Consultant" with over 20 years' experience in evaluating claims, who on January 14, 2016, also recommended that Allstate tender the policy limits. Her evaluation noted Mr. Firchow's DUI arrest as leading to "aggravated liability." She testified in deposition that juries tend to award more in damages against a defendant who was a drunk driver:

"Q. And when it's aggravated liability, is that because it means there's a potential for punitive damages, or a higher damages award, based upon the drunk driving being involved?

A. Well, juries – if the case ever gets to the point where there's juries involved, they tend to look poorly on people who are arrested for drunk driving, so they tend to give more general damages. And if they give punitives, that's separate, but we don't cover that." (Hubbell Dep., 25:5-13.)

Thus, by no later than December 3, 2015, when Legrand sent Firchow a letter informing him he was at fault for the accident, Allstate had all the information it needed to accept the policy limits demand. It knew that Ms. Galvez had been hospitalized for three days and undergone one surgery, and might require a second surgery to remove the screws placed in her ankle. It knew she would require further physical therapy once her bone healed sufficiently. It knew Firchow was 100% at fault for the accident and that a jury would likely award Ms. Galvez high general damages because she had been struck by a drunk driver. The initial policy limits demand was reasonable because it gave Allstate enough information to respond and enough time to process the information.

Allstate has repeatedly claimed that it could not assess the demand without knowing the precise medical bills incurred by claimant. However, nowhere does Allstate present any evidence that the company generally, or any of its employees, is not generally familiar with the prices commonly charged for medical services such as the surgery and hospitalization that Galvez underwent. Legrand, who had been an adjuster for more than 20 years, testified that at any given time she was working on

perhaps 200 different claims. It is, at the very least, an issue of fact whether Allstate should have realized that Galvez had incurred medical bills high enough that, when couple with the aggravated liability of Firchow, showed a substantial likelihood of Galvez obtaining a judgment in excess of $100,000. Allstate should have accepted the November 20, 2015 settlement demand.

2.   The January 6, 2016, Settlement Demand Was Reasonable

The January 6, 2016, policy limits settlement demand sent by claimant's counsel was also reasonable. It contained the medical billing information showing that Ms. Galvez had incurred charges of $59,862.20. This information confirmed what Allstate already knew, which is that Ms. Galvez was substantially likely to obtain a judgment well in excess of $100,000 should a lawsuit be filed.

Allstate's motion argues that the demand was unreasonable because it gave Allstate only three business days to respond. However, given the information Allstate had already received, three business days should have been more than enough time for Allstate to determine to offer the policy limits. In fact, Allstate should have accepted the original settlement demand. The medical billing records that accompanied the January 6, 2016, demand merely confirmed a decision that Allstate should already have made, to offer the policy limits, based on the clear and aggravated liability of Firchow and the injuries Galvez had sustained.

D.   Allstate Did Not Act Reasonably

Allstate's motion asks the Court to find, as a matter of law, that Allstate did not act unreasonably when, over the 47-day period from November 27, 2015, when it admits it received the first policy limits demand, through January 13, 2016, when the second demand expired, it refused to offer the $100,000 policy limits to settle Galvez's claim, although that claim eventually resulted in a $2.4 million judgment against Firchow.

In so arguing, Allstate minimizes (or ignores) the facts set forth above showing that it knew by no later than December 3, 2015 that Firchow was 100% at

fault for the accident, that liability was aggravated because he had been driving while intoxicated, and that Galvez had been hospitalized for three days after that accident, that three metal screws had been placed in her ankle to hold it together in the surgery she underwent on October 24, 2015, with the possibility that a further surgery would be required to remove them, that she had been told not to put weight on her ankle for several weeks, and that she would need a course of physical therapy once her surgically repaired ankle bone had healed enough to withstand it.

Allstate's position, in essence, is that no rational finder of fact could find that it acted unreasonably, because at the very end of that 47-day period at least two Allstate employees overlooked Galvez's second policy limits demand which expired on January 13, 2016. Allstate has argued that the 24 days between November 27, 2015, when Allstate acknowledges it received the demand letter from Ms. Galvez's counsel, and the demand's expiration date of December 21, 2015, was "not enough time for Allstate to make any progress in evaluating the claim." This is simply untrue because, as noted, Allstate had enough information to have accepted the initial policy limits demand by December 3, 2015.

Thus, without even considering Allstate's actions with respect to the January 6, 2016, demand, a jury could reasonably infer that Legrand decided , based on her history of settling other broken ankle claims (but not necessarily claims involving a drunk driver and an internal fixation of the ankle) for less than $100,000, not to investigate the claim thoroughly. There is no evidence that Legrand, or anyone at Allstate, did any work on the Galvez claim at all between December 15, 2015 and Vickie Hubbell's cursory review of the medical billing records on January 11, 2016. Plaintiff submits that there is substantial evidence that Allstate did act unreasonably, and that it should be left to the trier of fact to determine whether breached the covenant of good faith and fair dealing that it owed to its insured.

Allstate's unreasonable refusal to settle continued after it received the January 6, 2016, demand. Allstate's moving papers treat the events of January 11-13, 2016,

-35-

1  as if they occurred in a vacuum. The fact is Allstate had done nothing to follow up

2  on the status of the original policy limits demand after December 15, 2015.  Allstate

3  argues it had only three business days to respond to the January 6, 2016, demand.

4  (Brief at 19, lines 1-3.) In fact, if Cathy Legrand did not know of the January 6,

5  2016, demand before it expired, she did know that the previous demand had expired

6  with no word from Galvez's counsel granting an extension, i.e., she knew that

7  Allstate had not accepted the policy limits demand and Galvez might file suit at any

8  time. Despite this knowledge, it was not until January 14, 2016, that Legrand further

9  evaluated the case and recommended offering the policy limits. A jury could easily

10 infer that this belated activity was merely a frantic attempt by a "rattled" Legrand to

11 make up for the previous 47 days of inaction after Allstate realized that its hardline

12 attitude that broken ankle cases are not worth $100,000 was incorrect.

13         In an effort to avoid such a jury finding, Allstate relies on several factually

14 inapposite cases to support its claim that its actions were reasonable.

15         Thus, Allstate cites *Graciano v. Mercury Gen. Corp.*, 231 Cal. App. 4th 414,

16 179 Cal. Rptr. 3d 717 (2014), for the proposition that an insurer that through

17 negligence or mistake does not timely accept a policy limits demand is not liable for

18 bad faith as a matter of law. In *Graciano*, the party making the original policy limits

19 demand misidentified the policy due to its own confusion over the name of the

20 insured allegedly responsible for the accident. The insurance company did not

21 accept the demand because the policy it referenced had expired. But later, when the

22 insurance company was notified regarding the policy that did provide coverage for

23 the accident, it did attempt to settle the claim. (*Id*. at 430-34.) The Court of Appeal

24 noted that the insurer was able to clear up the confusion over the applicable policy

25 and offer the limits of that policy within three weeks. Although there was evidence

26 that the insurer could have acted more quickly, the court found that its actions did

27 not rise to the level of bad faith. (*Id*. at 434-5.)

28

1   Here, by contrast, Allstate did virtually nothing to investigate the Galvez

2   claim despite being provided with ample evidence of her extensive injuries and

3   treatments and of Firchow's liability. Unlike *Graciano*, where the insurer had reason

4   to be confused about the applicable policy based on having been sent incorrect

5   information, Allstate was informed early on by Galvez's counsel of the facts

6   supporting the policy limits demand. The facts of *Graciano* do not support Allstate's

7   motion.

8   Allstate also cites *Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th 713, 68 Cal.

9   Rptr. 3d 746 (2007), for the general proposition that a bad faith claim may not be

10   founded on an insurer's neglect or mistake. However, the California Supreme Court

11   in *Wilson* reversed a summary judgment obtained by an insurer that had made

12   precisely that claim. *Wilson* was a first-party case where the insurer failed to pay

13   policy benefits claimed by its insured. In reversing the summary judgment, the

14   California Supreme Court found that the insurer had breached its duty to fully and

15   fairly investigate the claim when the adjuster handling the claim decided not to

16   accept the opinion of the insured's doctor that her injuries had been caused by an

17   accident but did not otherwise investigate. (*Id.* at 721-3.) *Wilson* supports plaintiff's

18   position here, where Allstate conducted no investigation of its own despite having

19   received two policy limits demands. Like the adjuster in *Wilson*, Legrand apparently

20   decided not to diligently investigate the policy limits demand based on her belief

21   that broken ankle claims could be resolved for less than $100,000. To the extent that

22   *Wilson* is relevant here, it supports plaintiff, not Allstate.

23   Allstate's reliance on *Pureco v. Allstate Indem. Co.*, 817 F.App'x 398 (9th Cir.

24   2020) is similarly misplaced. In that case, the attorney for the claimant repeatedly

25   refused to provide Allstate with information about his client's injuries until a Friday,

26   when his policy limits demand was due to expire the following Monday. The 9th

27   Circuit noted there was evidence that the claimant's attorney may have known the

28   Allstate agent handling the claim was not even in the office that Friday. Allstate did

accept the policy limits demand on the next Tuesday, one day after it expired; the court found in that case Allstate was at most negligent and not liable for bad faith. (*Id.* at 401.) Here, by contrast, Galvez's attorney, Matthew Joy, provided Allstate with more than ample information regarding his client's injuries and treatments in sufficient time for Allstate to assess it before the expiration of either of the two policy limits demands. There is no evidence of gamesmanship on his part, merely evidence of Allstate's refusal to follow up on the information it was given that supported the policy limits demand. *Pureco* in no way aids Allstate in the instant motion.

*McDaniel v. Gov't Emps. Ins. Co.*, 681 F. App'x 614 (9th Cir. 2017), also relied upon by Allstate, similarly does not support the motion. In *McDaniel*, the GEICO adjuster handling the claim knew that the claimant had made a policy limits demand but mistakenly believed the time limit for the demand had been tolled pending the service by the claimant of discovery responses. The adjuster believed the discovery responses were overdue and failed to read an email from counsel stating they had been received. Upon receiving the responses the adjuster accepted the demand. The court found this conduct was mere negligence, and not bad faith.

Here, however, the evidence supports an inference that Legrand did not believe a broken ankle claim could support a policy limits demand and as a result failed to investigate it. Unlike in *McDaniel*, where the court impliedly found that GEICO had reasonably investigated the claim, the evidence here shows that Legrand did very little to investigate the Galvez claim. Legrand did not attempt to obtain information regarding even a likely range of what Galvez's medical bills would be, and took no actions to follow up on whether claimant's counsel had granted Allstate's request for an extension of the original December 21, 2015 deadline. Legrand did not prepare an evaluation of the policy limits demand until January 14, 2016, the day after receiving the telephone call from Joy informing her the second policy limits demand had expired. A jury could reasonably find that Allstate's

1  curious inaction between December 3, 2015, and January 14, 2016 was not the result

2  of negligence but instead of a conscious decision to play dice with Firchow's future

3  by paying less than $100,000 to settle the Galvez claim. *McDaniel* does not provide

4  any reason to grant the motion.

5        Allstate also mistakenly relies on *Boicourt v Amex Assurance Co.*, 78 Cal.

6  App. 4th 1390, 93 Cal. Rptr. 2d 763 (2000) to argue that it was somehow free to

7  ignore the time limits set by Galvez's counsel to respond to the two settlement

8  demands. In *Boicourt*, the defendant insurer initially refused to disclose its policy

9  limits to the attorney for the claimant, who then filed suit. The insurer offered the

10  policy limits several months later, but the suit proceeded to trial and resulted in an

11  excess judgment against the insured. In the subsequent bad faith case, the Court of

12  Appeal, after pointing out that refusing to disclose the policy limits, or asking its

13  insured for permission to do so, served the interests of the insurance company and

14  not the insured, reversed a summary judgment obtained by the insurer. The court

15  found that the record did not necessarily establish good faith by the insurer, and

16  further stated, "and if the offer was indeed too late, it did not cure the act of bad

17  faith in initially foreclosing settlement." (78 Cal. App. 4th at 1400.) *Boicourt* thus

18  undercuts defendant's position because it shows that the reasonableness of Galvez's

19  demands – including the time limits they imposed – and of Allstate's actions are

20  questions of fact, not appropriate for resolution on summary judgment.

21        Thus, nothing in the authority Allstate has cited supports its claim that as a

22  matter of law it must be found to have acted reasonably when it failed to accept

23  either of Galvez's settlement demands. The law instead mandates the conclusion

24  that the determination of whether Allstate unreasonably refused to settle the Galvez

25  claim for the policy limits is an issue of fact for the jury.

26        E.    Allstate Unreasonably Refused To Settle The Case

27        Allstate also argues that it did not unreasonably refuse to settle the case.

28  However, at no point after January 15, 2016, did Allstate ever offer more than the

1  policy limits to settle the case until months after Ms. Galvez obtained a $2,427,015
2  judgment against Mr. Firchow in May 2019. Allstate refused to offer more than the
3  policy limits despite receiving numerous evaluation letters from McClaughtery &
4  Associates, the firm it engaged to defend Firchow in the Galvez lawsuit, that a
5  judgment in excess of the policy limits was likely.

6        Allstate also skips over the fact that Firchow had to endure four years of
7  stress and uncertainty, including a trial, before Allstate belatedly realized that it
8  would certainly be liable on a bad faith claim if it did not. Allstate's action in paying
9  a $1.85 million settlement to Galvez was merely a highly belated attempt at
10 mitigating the damages that it knew it would be required to pay. Allstate makes no
11 attempt to explain why it did not settle the Galvez case until 2020, but the inference
12 is clear: as the California Supreme Court said in *Crisci*, the $2.4 million judgment
13 against Firchow was evidence that Allstate did not act reasonably when it failed to
14 accept either of the two policy limits demands it had received. Allstate's eventual
15 settlement of the Galvez claim did not compensate Firchow for the four years of
16 stress and anxiety he suffered by having to undergo a trial that was entirely
17 avoidable.

18 IV.   The Breach Of Contract Claim Is Viable

19       Allstate also argues that Firchow's breach of contract claim must fail because
20 Allstate did provide a defense for Firchow and did, ultimately, pay the judgment
21 Galvez obtained. Allstate cites *Archdale v. Am. Internat. Specialty Lines Ins. Co.*,
22 154 Cal. App. 4th 449, 64 Cal. Rptr. 3d 632 (2007) in support of this argument.

23       However, the court in *Archdale* noted that an insurer's breach of the covenant
24 of good faith and fair dealing, which Firchow has alleged here, "sounds both in
25 contract and in tort" and that whether the insured's remedy for the breach is in
26 contract or tort depends on the relief sought. (*Id*. At 466.) The court in *Archdale*
27 found that an insured's breach of contract claim, which involved only an alleged
28 breach of the obligation to defend and indemnify the insured, could not proceed. But

1  the court also found that the insured was free to pursue a breach of contract claim

2  based on the breach of the implied covenant of good faith and fair dealing, as

3  Firchow does here. (*Id*. at 468-9.) The motion should therefore be denied as to

4  Firchow's breach of contract cause of action.

5            V.   <u>Firchow Has A Valid Claim For Punitive Damages</u>

6         Allstate argues, finally, that it cannot be held liable for punitive damages

7  because there is no evidence that its conduct was malicious, fraudulent or despicable

8  as required by California Civil Code § 3294 and cases such as *Tomaselli v.*

9  *Transamerica Ins. Co.*, 25 Cal. App. 4th 1269, 31 Cal. Rptr. 2d 433 (1994).

10  Allstate's argument focuses only its claimed negligence in not accepting Galvez's

11  policy limits demands and on the fact that it ultimately did settle and pay the

12  judgment Galvez obtained.

13         Allstate leaves out, however, everything that happened between January

14  2016, when it failed to accept the policy limits demand, and February 2020, when it

15  settled with Galvez. The evidence shows that Allstate intentionally pursued a course

16  of conduct that caused extreme distress and anxiety for Firchow for over four years,

17  as it compounded its initial bad faith refusal to settle by never offering more than the

18  policy limits to settle the case until after Galvez obtained a $2.4 million judgment

19  against Firchow. Rosie Arambula, the adjuster who took over the claim after the

20  Galvez lawsuit was filed in January 2016, confirmed in her deposition that she had

21  no knowledge of Allstate offering more than the policy limits to settle the case over

22  the ensuing three years, until after the trial. (Arambula Dep., 31:23-32:6.)

23         Ms. Arambula's declaration filed with the motion (see Joint Appendix at 273-

24  4) also makes no mention of any attempt to settle the case by Allstate despite having

25  received a series of escalating estimates from Firchow's defense counsel,

26  McClaugherty & Associates, of the value of the case, rising from an initial estimate

27  of just over $100,000 in 2016, to an estimate of $185,000 to $235,000 in May 2017,

28  to as high as $1.69 million before trial in early 2019. The evidence shows that

Allstate consciously persisted in refusing to settle the case for more than three years, forcing Firchow to undergo the stress and rigor of everything involved with a trial, from being deposed to testifying at trial and then worrying about the impact the massive judgment would have on his life.

Ms. Arambula's declaration states that she is not an officer, director or managing agent of Allstate, as if that would immunize the company from liability for punitive damages. The declaration conspicuously does not state that she had ultimate authority over Allstate's decision not to try to settle the action. Contrary to the averments of the moving papers, the evidence is clear and convincing that Allstate refused to settle the action for four years, all to the detriment of Firchow, in the obvious hope of attempting to minimize its own exposure. The fact that Allstate belatedly realized the error of its ways and paid the Galvez judgment does not protect it from a finding that its conduct in forcing its insured to endure years of litigation in a case that it could and should have settled meets the standard for imposition of punitive damages. Plaintiff therefore asks the Court to deny the motion as to punitive damages as well,  and allow the jury to determine the culpability of Allstate's conduct.

## IX.   CONCLUSION

Allstate has not carried its burden as moving party of presenting evidence that establishes that its actions were reasonable. Substantial evidence demonstrates that Allstate did not act reasonably, and the motion should therefore be denied so that a jury may determine the extent of Allstate's liability.

Respectfully submitted,

1   Dated:  July 20, 2021          SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

2

3                                          By   _____
                                                          /s/ *Marc J. Feldman*
4                                                         MARC J. FELDMAN

5                                          Attorneys for Defendant ALLSTATE
6                                          NORTHBROOK INDEMNITY COMPANY
                                           (erroneously sued as ALLSTATE INSURANCE
7                                                        COMPANY)

8

9   Dated:  July 20, 2021          LAW OFFICES OF BRIAN BRANDT

10

11                                         By   _____
                                                          /s/ *Brian Brandt*
12                                                        BRIAN BRANDT

13                                         Attorneys for Plaintiff
14                                         ROBERT FIRCHOW

15

16

17

18

19

20

21

22

23

24

25

26

27

28